UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER,

    *Plaintiff*,

  v.

DEPARTMENT OF JUSTICE,

    *Defendant*.

Civil Action No. 18-1868 (TNM)

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR
SUMMARY JUDGMENT AND MOTION TO
<u>COMPEL DEFENDANT TO SEEK AN *OPEN AMERICA* STAY</u>**

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

January 21, 2022     *Attorneys for Defendant*

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... ii

Factual and Procedural Background .................................................................................. 1

Standard of Review ............................................................................................................ 2

Argument ............................................................................................................................ 2

    I.     Plaintiff's Motion Should Be Denied Because The Duplication Fees Charged By The FBI Is Reasonable. ............................................................................................. 2

    II.    Plaintiff's Motion Should Be Denied Because The Current Schedule, 500 Pages Per Month, Is Reasonable. .................................................................................................. 7

    III.   The Court Should Deny Plaintiff's Request To Compel Defendant To Seek An Open America Stay *Again*. ..................................................................................... 9

Conclusion ....................................................................................................................... 11

# **TABLE OF AUTHORITIE**

**Cases**

**Page**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................................................2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................................................2

*Colbert v. FBI*,
No. 16-cv-1790, 2018 WL 6299966 (D.D.C. Sept. 3, 2018)..........................................7

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
No. 17-cv-1283, 2020 WL 6939807 (D.D.C. Nov. 25, 2020).........................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................................................2

*Middle E. Forum v. U.S. Dep't of Homeland Sec.*,
297 F. Supp. 3d 183 (D.D.C. 2018).................................................................................8

*Nat'l Sec. Couns. v. Dep't of Just.*,
305 F. Supp. 3d 176 (D.D.C. 2018) *summ. aff'd*, No. 18-5171, 2018 WL 6167377, at *1 (D.C. Cir. Nov. 1, 2018).........................................................................................................9

*Open America v. Watergate Special Prosecution Force*,
547 F.2d 605 (D.C. Cir. 1976).........................................................................................9

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991).......................................................................................8

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994)...........................................................................................2


**Statutes, Regulations, Rules, and Other Authorities**

5 U.S.C. § 552.............................................................................................................1, 2, 7

28 C.F.R. § 16.10........................................................................................................3, 7

Fed. R. Civ. P. 56.............................................................................................................2

Defendant, Department of Justice ("Department" or "Defendant"), respectfully submits this opposition to Plaintiff Assassination Archives and Research Center's ("Plaintiff" or "AARC") partial motion for summary judgment and motion to compel Defendant to seek an Open America Stay.  Plaintiff commenced this action on August 8, 2018, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  *See generally* ECF No.1, Compl.  Under FOIA, Plaintiff sought records relating to pre-1960 electronic surveillance activities from the Federal Bureau of Investigation ("FBI").  *See id.*  The FBI has been processing and producing these records in accordance with a priority list provided by Plaintiff on October 30, 2020.  Due to the volume of records involved, the FBI does not have a precise figure but estimates that it has approximately 22,500 pages left to process in this case.[1]  The FBI currently processes 500 pages a month.  Plaintiff requested that the records be placed on a CD, so Plaintiff pays a $15 duplication fee and receives the 500 pages on a CD.

Plaintiff argues that the $15 is unreasonable and based on the FBI's current process rate request that this Court compel Defendant to move for an *Open America* stay.  As discussed in further detail below, the cost associated with processing Plaintiff's requests is reasonable and the rate of 500 pages per month is justified and therefore an *Open America* stay is not warranted in this matter.  Plaintiff's motions provide no basis to conclude otherwise and thus should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant incorporates the Statement of Undisputed Material Facts that are filed contemporaneously with this Memorandum.

---

[1]   The FBI welcomed further guidance from Plaintiff on narrowing criteria that can be applied to the search results to reduce the volume of records that need to be processed.  To date, Plaintiff has provided no suggestions.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving part may not rest upon the mere allegations or denials of his pleading but must instead establish more than "the mere existence of a scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252. Thus, summary judgment is due if the non-moving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Id.* When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

**ARGUMENT**

## I.   PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE THE DUPLICATION FEES CHARGED BY THE FBI IS REASONABLE.

Plaintiff argues that the FBI's fees, $15 for each CD with 500 pages a month, is unreasonable and relies on a declaration from over three years ago. Specifically, Plaintiff relies on a declaration submitted in a different FBI case, to challenge the FBI's justification for charging $15.00 per CD for interim releases, claiming that this fee does not reflect "reasonable standard charges," or "direct costs" reflected in § 552(a)(4)(A)(ii)(III). Pl. Mot. at 5. Plaintiff claims that

the FBI's "unnecessarily complex and redundant 'security review process,'" ignores the statutory restrictions placed on its ability to charge fees under FOIA. *Id.* Plaintiff's reliance on the declaration is misplaced. As described by Defendant, $15 is a reasonable duplication fee and actually less than the direct cost of running the search and reproducing the records on the CD. The D.C. Circuit has agreed and recently affirmed the reasonableness and appropriateness of the FBI's $15 per CD charge for FOIA releases. *See Nat'l Sec. Couns. v. Dep't of Just.*, 305 F. Supp. 3d 176, 181 (D.D.C. 2018) (granting summary judgment on remand, finding there existed no genuine issue of material fact that the FBI's $15 per CD charge is lawful), *summ. aff'd*, No. 18-5171, 2018 WL 6167377, at *1 (D.C. Cir. Nov. 1, 2018) ("The district court did not err . . . by concluding that the undisputed evidence showed that the fee was not excessive.").

The Department has promulgated regulations providing for the assessment of fees with regard to the Freedom of Information Act. *See* 28 C.F.R. §16.10, et seq. These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs associated with the salary of an employee performing the work. *Id.* at §16.10(b)(2). Further, the regulations provide for charging for duplication costs in reproducing copies of records. *Id.* at §16.10(b)(3). Under these regulations, the FBI determined that Plaintiff is a general (all other) requester, as described in the Declaration of Michael G. Seidel ¶ 7, subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request. Per Department regulations, for copies produced on tapes, disks, or other media, an agency "shall charge the direct costs of producing the copy, including operator time. Where paper documents must be scanned to comply with a requester's preference to receive the records in electronic format, the requester shall pay the direct costs associated with scanning those materials." *Id.* at §16.10(c)(2).

The FBI constantly seeks ways to improve efficiency, especially given the sharp rise in Freedom of Information/Privacy Act ("FOIPA") requests and FOIPA litigation, without a commensurate increase in resources.[2]  While the detailed description provided by Plaintiff, *see* Pl. Mot. at 6-8, reflects the FBI process at the time of the referenced litigation (2017), it is not a truly accurate reflection of the steps followed today.  Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 34.  The FBI has made enhancements to FDPS to improve efficiency; however, this has not resulted in a reduction of direct costs below $15.00.  *Id.*  As before, the direct costs involved in preparing a CD for release, remain in excess of the $15.00 minimal charge.  *Id.*

Plaintiff describes use of the former security program "Integrity" in steps 4 and 8.  Pl. Mot. at 7.  This program is no longer in use.  *Id.* ¶ 35.  Instead, the FBI leverages Optical Character Recognition ("OCR") capability, which has been a result of enhancements to the FOIA Document Processing System ("FDPS"), to perform security scans based on lists of "exempted terms" *Id.* These scans are referred to internally as "Exempt Term Searches" or "ETS".  *Id.*  The benefit of this improvement to FDPS is that it eliminates steps 2 through 6 discussed in Plaintiff's motion. *Id.*  The FOIA Analyst no longer has to export or convert the documents prior to running ETS, resulting in greater efficiency.  *Id.*

Despite this improvement and reduction of the number of steps required outside of FDPS, the FOIA Analyst must still perform certain necessary tasks before releasing a CD to the public. *Id.* ¶ 36. While the FBI no longer utilizes "Integrity" as a security program for FOIPA processing, the remaining steps, which involve human analysis and review, discussed in Plaintiff's motion are

---

[2]     The FBI is currently inundated with an extraordinary number of FOIPA requests.  In recent years the FBI has experienced a spike in request submitted to the agency.  In Fiscal Year ("FY") 2021, the FBI received 29,828 FOIPA requests (a 34% increase over intake from five years ago), when in FY 2016, intake was 22,220 requests.  In FY 2021, the FBI resolved 29,429 FOIPA requests and reviewed over 868,000 pages of records in response to FOIPA requests.

still applicable, although slightly changed using ETS instead.  *Id.*; *see also* Pl. Mot. at 8.

In the majority of instances, the RIDS employees who are responsible for setting up and running the ETS scans range in grade from GS-11 to GS-13.  *See* Seidel Decl. ¶ 37.  Based on the 2021 Salary Table issued by the Office of Personnel Management for the Washington D.C. locality (in which RIDS is located), the minimum hourly salary for a RIDS employee running ETS is $34.98 per hour (GS-11, Step 1) and the maximum hourly salary for a RIDS employee running ETS is $64.81 per hour (GS-13/Step 10).  *See* http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2021/DCB.  In RIDS's experience, it generally takes approximately 46 minutes to set up and run the ETS scan for 500 pages.  *See* Seidel Decl. ¶ 37.  Therefore, assuming that it takes 46 minutes to set up and run ETS:

- The minimum operator cost for the ETS process alone is $26.81.

- The maximum operator cost for the ETS process alone is $49.69.

- The average operator cost for the ETS process alone is $38.25.

The amount of time it takes to set up and run ETS increases as more pages are added that need to be scanned and/or as more search terms are added to the ETS search protocol.  *Id.*  Moreover, the costs listed above do not include the costs associated with re-running the scan after any corrections that need to be made.  *Id.*

Prior to running ETS, work items proposed for release are "sealed" by an Expert or Supervisor who has reviewed and approved the Analyst's work.  *Id.* ¶ 38.  This changes the translucent redaction blocks on each page to solid blocks for the release of segregable information.  *Id.*  As part of the ETS process, a FOIA Analyst must run multiple ETS searches against each "sealed" work item in the monthly release using certain standard exempt terms, in addition to running one or more searches for case specific exempt terms against each sealed work item.  *Id.*

5

The Analyst creates the case specific exempt term list as they are processing each work item, but the exempt nature of a term often depends on the context in which it appears. *Id.* This context can vary between records and is not something that a computer program can easily differentiate. *Id.* While ETS can flag for review all instances of a term that has been redacted elsewhere in the production, it is human analysis that is required to manually review those flagged "hits" to determine if the term was released in error, or if the context in that instance allows disclosure. *Id.* If the Analyst determines the term to be exempt and released in error, the Analyst must have an Expert or Supervisory employee "unseal" the work item so they can correct the mistake, and once corrected by the Analyst and verified by the Expert or Supervisor, the Expert or Supervisory employee must reseal the work item before the Analyst can run the scan again. *Id.* Analysts do not have the ability in FDPS to seal and unseal their own work items, for integrity of quality control. *Id.* This process is repeated until the Analyst has confirmed that no exempt information is released. *Id.* This is a time consuming and labor-intensive process, but absolutely necessary to ensure that no exempt information is inadvertently released, that all segregable non-exempt information is released, and to protect FBI (and often other government agencies, and foreign government) sensitive equities within the records. *Id.*

The direct cost of running ETS and creating the CD previously exceeded the $15.00 charged by the FBI and it still exceeds $15.00. *Id.* ¶ 39. Despite the improvements discussed above which eliminated several steps in the process, when pay rates and average time to perform the current steps are calculated, the direct cost still remains above $15.00 and is therefore reasonable. *Id.*

The FBI has carefully balanced the volume of responsive records along with Plaintiff's interests, while also recognizing and preserving the rights of other litigants and requesters in

6

accessing information they seek.  *Id.* ¶ 42.   The FBI has explained how processing records on the classified enclave is efficient, security-compliant, reduces risk of compromise, promotes consistency, and is a better use of FBI's limited resources given its myriad investigative and national security missions.  *Id.*  The FBI has outlined the necessary steps employed to prepare a CD for public dissemination and determined that the FBI's policy of charging $15.00 per CD is an appropriate and reasonable assessment of duplication fees, consistent with the FOIA, 5 U.S.C. § 552(a)(4)(A)(ii) and DOJ's FOIA fee regulation at 28 C.F.R. § 16.10. *Id.*

Therefore, $15 for each CD with 500 pages per month is reasonable and the Court should deny Plaintiff's motions.

## II.   PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE THE CURRENT SCHEDULE, 500 PAGES PER MONTH, IS REASONABLE.

Plaintiff argues that 500 pages a month is unreasonable and instead requests that this Court order Defendant to process thousands of records a month.  *See* Pl. Mot. at 7.  Plaintiff relies on cases filed more than ten years ago.  As the Court previously ruled, 500 records per month is reasonable and more than the amount of pages normally ordered.  *See* Ex. A, Transcript of Status Conference at 4.  Further, in *National Security Counselors v. Department of Justice*, 848 F.3d 467, 471-72 (D.C. Cir. 2017), the Court determined that 500-page increments is reasonable and further supports the FBI's interim release policy, serving to promote efficient responses to a larger number of requesters.  As described further below, based on the FBI's office and employee size, other FOIA requests in the queue, and pending lawsuits, 500 pages per month is still reasonable.

It is well established that "[c]ourts have broad discretion to determine a reasonable processing rate for a FOIA request."  *Colbert v. FBI*, No. 16-cv-1790, 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018).  "Several factors inform the analysis, including the size and compelling need of the request compared to others, as well as the effect of the request on the [agency's] ability

to review other FOIA requests."  *Id.*; *see also Middle E. Forum v. Dep't of Homeland Sec.*, 297 F.

Supp. 3d 183, 185 (D.D.C. 2018) (observing that "courts in this Circuit have considered the effect

of other FOIA requests when analyzing the burden on an agency of meeting deadlines for review

and production of FOIA material in a given case").  Moreover, "[a]gency affidavits or declarations

that are 'relatively detailed and non-conclusory' are accorded 'a presumption of good faith, which

cannot be rebutted by purely speculative claims[.]'"  *Jud. Watch, Inc. v. Dep't of Com.*, Civ. A.

No. 17-1283, 2020 WL 6939807, at *2 (D.D.C. Nov. 25, 2020) (quoting *SafeCard Servs., Inc. v.

SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

The FBI currently employs 237 Government Information Specialists ("GISs"), with

support from 89 contractors, to process requests for FBI information under the FOIA and Privacy

Acts and conduct classification and declassification reviews.  Seidel Decl. ¶ 20.  Operationally,

the FBI has one of the largest and most complex FOIPA programs in the federal government

receiving upwards of 40,200 pieces of annual correspondence[3] per Fiscal Year (FY) while

reviewing an average of approximately one million pages for annual dissemination to the public.

*Id*. ¶ 22.

FBI's interim release policy is to review/process records in 500-page increments per month

per request or per litigation.  *Id.* ¶ 24.  By processing and making interim responses based on 500-

page work items, the FBI is able to provide more pages to more requesters, thus avoiding a system

where a few large requests or litigations monopolize finite processing resources and where fewer

requesters' FOIPA requests are being fulfilled.  *Id.* ¶ 24, fn. 13.  By working in 500-page

increments, the FBI has found that more pages get processed, reviewed, and released to more

---

3        Includes the average for total of incoming receipts, appeals, other agency referrals and
consultations, and additional requester correspondence from FY 2018 to FY 2021.

requesters each month because processors can work on 500-page work items for several requests or litigations in a month. *Id.* Also, in terms of managing workflow, the interim releases can be assigned to multiple processors and the 500-page size has proven to be ideal for reviewing officials, and other components or agencies that must be consulted before release. *Id.* ¶ 26. Further, maintaining a steady interim release posture is key in meeting the demands posed by the growing number, size, and complexity of FOIPA requests received by the FBI. *Id.* ¶ 24, fn. 13. Moreover, many FBI records contain classified information requiring the FBI FOIPA requests to be processed on a classified computer network. *Id.* Due to the security requirements, the 500-reviewed pages size has proven ideal in maintaining a steady release flow. *Id.* The running of these security protocols, and resolving any issues that may arise, can require a significant amount of effort and time which increases as more pages are added. *Id.* In RIDS's experience, maintaining a steady 500 ppm interim release posture is key in meeting the demands posed by the growing number, size, and complexity of FOIPA requests and lawsuits received by the FBI. *Id.* The standard policy promotes both agency and requester efficiencies. *Id.*

Thus, based on its discretion, the Court should deny Plaintiff's motions and order that Defendant may proceed with processing 500 pages per month because it is reasonable.

## III.   THE COURT SHOULD DENY PLAINTIFF'S REQUEST TO COMPEL DEFENDANT TO SEEK AN *OPEN AMERICAN* STAY AGAIN.

Plaintiff moves the Court to compel Defendant to seek an *Open America* stay or an order to produce 1700 pages per month. *See* Pl. Mot. at 6. Plaintiff's verbally sought this same relief at the Status Conference on August 6, 2019, and the Court denied Plaintiff's verbal requests. *See* Ex. A at 4. The Court should yet again deny Plaintiff's request because the circumstances are no different than they were on August 6, 2019. As the Court correctly determined 500 pages per

month is "really on top" of what is normally ordered, and since the FBI is currently processing records on a schedule an *Open America* stay is not necessary.  *See id.* at 4.

This instant matter is distinguishable from *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976).  In *Open America*, the plaintiff's FOIA request was deep in the FBI's then-existing backlog and had not been processed.  *Id.*  Here, the FBI has processed Plaintiff's FOIA requests and released records.  Specifically, beginning on February 4, 2019 and continuing through December 30, 2021, the FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001.  *See* Ex. A at 3-4.  The FBI advised Plaintiff in each response the exemptions claimed, and of the duplication costs associated with each release.  Seidel Decl. ¶ 17

As the Court previously ordered, an *Open America* stay was unnecessary and inappropriate in his matter because there is ongoing production. Therefore, the Court should deny Plaintiff's motion again.

*     *     *

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment and motion to compel.

Dated: January 21, 2022          Respectfully submitted,

                                        MATTHEW M. GRAVES, D.C. Bar # 481052
                                        United States Attorney

                                        BRIAN P. HUDAK
                                        Acting Chief, Civil Division

                                        */s/ Stephanie R. Johnson*
                                        STEPHANIE R. JOHNSON
                                        D.C. Bar # 1632338
                                        Assistant United States Attorney
                                        Civil Division
                                        555 4th Street, N.W.
                                        Washington, D.C. 20530
                                        (202) 252-7874
                                        Stephanie.Johnson5@usdoj.gov

                                        *Attorneys for Defendant*

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND<br>RESEARCH CENTER,<br><br>     *Plaintiff*,<br><br>    v.<br><br>DEPARTMENT OF JUSTICE,<br><br>     *Defendant*. | Civ. A. No. 18-1868 (TNM) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56(b) and Local Civil Rule 7(h), Defendants respectfully submit this statement of undisputed material facts. The information herein is largely repeated from the declaration of Michael G. Seidel, who describes, for Plaintiff and the Court, the administrative history of Plaintiff's FOIA requests, describe the reasonable costs associated with processing Plaintiff's requests, and provide the Federal Bureau of Investigation ("FBI") justification for processing FOIA requests at a rate of 500 pages per month. The declaration of Seidel, and accompanying attachments support the following statement:

1.     Beginning on February 4, 2019 and continuing through December 30, 2021, the FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001. Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 17. The FBI advised Plaintiff in each response the exemptions claimed, and of the duplication costs associated with each release. *Id.* The FBI further informed Plaintiff in each response to refer to letter dated November 9, 2018, *see* Ex. K, for information on the actions to be taken by the FBI in regard to Plaintiff's FOIA requests 1386188-000 and 1386440-000. Seidel Decl. ¶ 17.

2.      As of January 1, 2022, there are approximately 22,211 pages remaining to be processed. *Id.* ¶ 18.  It should be noted that this is a rough estimate of pages, an exact number of pages remaining is difficult to determine due to the voluminous nature of the documents as well as the age and type of the documents.  *Id.*  The FBI does not have a record of Plaintiff submitting the duplication fees for the twentieth, twenty-first, or twenty-second interim releases totaling $37.50.  *Id.*

## I.      FBI's FOIPA PROCESSING RESOURCES, WORKLOAD, QUEUE STRUCTURE, AND INTERIM RELEASE POLICY

3.      The FBI currently employs 237 Government Information Specialists ("GISs"), with support from 89 contractors, to process requests for FBI information under the FOIA and Privacy Acts and conduct classification and declassification reviews, inter alia.  *Id.* ¶ 19.

4.      Operationally, the FBI has one of the largest and most complex FOIPA programs in the federal government receiving upwards of 40,200 pieces of annual correspondence[4] per Fiscal Year (FY) while reviewing an average of approximately one million pages for annual dissemination to the public.  *Id.* ¶ 22.

5.      The FBI FOIPA Program has experienced sustained growth in the volume of incoming receipts and cases in litigation from FY 2015 to present.  *Id.* ¶ 2.[3]  Notably, in FY 2018, the Program received an all-time high of 32,577 requests for records from the public, representative of a 47% increase in requests from FY 2016.  This historic incoming volume trend of above 30,000 requests per annum continued in FY 2019 and into the pandemic phase.  *Id.*  Combined with the rise in FOIPA litigation case growth of 114%[5] from FY 2015 (181 pending litigations) to FY 2021

---

4        Includes the average for total of incoming receipts, appeals, other agency referrals and consultations, and additional requester correspondence from FY 2018 to FY 2021.

5        In FY2021, the FBI received 136 new FOIPA lawsuits (or approximately two new cases

(388 pending litigations), RIDS's finite resources are continually challenged with this elevated request volume and complexity of requests.  *Id.*

## II.  THE DUPLICATION FEES CHARGED BY FBI ARE REASONABLE AND THE DIRECT COSTS ARE IN EXCESS OF $15.00 PER CD.

A.  Department of Justice ("Department") FOIA Fee Regulations

6.      The Department of Justice ("Department") has promulgated regulations providing for the assessment of fees with regard to the Freedom of Information Act.  *See* 28 C.F.R. §16.10, et seq.  These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs associated with the salary of an employee performing the work.  *Id.* at §16.10 (b)(2).  Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).

7.      Under these regulations, the FBI determined that Plaintiff is a general (all other) requester subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request.  Seidel Decl. ¶ 29.

8.      Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).  Under these regulations, the FBI determined that Plaintiff is a general (all other) requester as described above, subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request.  Per the DOJ regulations, for copies produced on tapes, disks, or other media, an agency "...shall charge the direct costs of producing the copy, including operator time.  Where paper documents must be scanned in order to comply with a requester's preference to receive the records in electronic format, the requester shall pay the direct costs associated with scanning those materials."  *Id.* at §16.10 (c)(2).

---

every week).

9.      The FBI advised Plaintiff that in accordance with his request for records to be re-produced on CD, the fee would be $15.00 per CD.  Seidel Decl. ¶ 30; *see also* Ex. L.

B.  The FBI's FOIA Document Processing System

10.     With its dual law enforcement and national security missions, the vast majority of the FBI's work is performed on classified systems.  Seidel Decl. ¶ 32.

11.     The primary records system the FBI searches in response to most FOIPA requests – the Central Records System – is accessed by the FBI's SENTINEL case management system, which is located on the FBI's SECRET-level classified enclave.  *Id.*

12.     Accordingly, the FBI's FOIA Document Processing System (FDPS), where responsive records are processed under FOIPA, is located on the classified enclave.  *Id.* Given the significant volume of classified and sensitive information in FBI records, operating in a classified space is both necessary, efficient, and comports with security protocols.  There is no unclassified system for processing of FBI FOIPA requests.  *Id.*

13.     Additionally, the complex and often classified nature of FBI records requires information equity coordination between RIDS and internal FBI subject matter experts as well as by external agency stakeholders via classified networks.  *Id.*

14.     Considering these facts, it is reasonable to process FBI records responsive to FOIPA requests on the secret enclave where FBI investigative and national security records are located because it promotes efficiency, consistency, reduces the risk of compromise, is security compliant, and is a better use of the FBI's limited resources.  Seidel Decl. ¶ 33.

C.  The FBI's FOIPA Security Process & Direct Cost Assessment

15.     The FBI constantly seeks ways to improve efficiency, especially given the sharp rise in FOIPA requests and FOIPA litigation, without a commensurate increase in resources.[6]  *Id.* ¶ 34.

16.     The FBI has made enhancements to FDPS to improve efficiency; however, this has not resulted in a reduction of direct cost below $15.00.  *Id.*  As before, the direct costs involved in preparing a CD for release, remain in excess of the $15.00 minimal charge.  *Id.*

17.      The "Integrity" program is no longer in use.  *Id.* ¶ 35.  As a result of FDPS technical enhancements, in its place but performing the same function, the FBI leverages Optical Character Recognition ("OCR") capability.  *Id.*  This OCR capability performs required pre-release security scans based on designated lists of "exempted terms."  *Id.*  These scans are referred to as "Exempt Term Searches" or "ETS."  *Id.*  The FOIA Analyst no longer must export or convert the documents prior to running ETS, resulting in greater business process efficiency.  *Id.*

18.     Despite this improvement and reduction of the number of steps required outside of FDPS, the FOIA Analyst must still perform certain necessary tasks before releasing a CD to the public.  *Id.* ¶ 36.  While the FBI no longer utilizes "Integrity" as the security application for FOIPA processing, the remaining steps require human analysis and review time.  *Id.*  Those manual review steps are still applicable albeit slightly modified using the ETS function.  *Id.*

19.     The analysts responsible for conducting pre-release ETS scans and reviews range in grade from GS-11 to GS-13.  *Id.* ¶ 37.  Based on the 2021 Salary Table issued by the Office of

---

[6]     The FBI is currently inundated with an extraordinary number of FOIPA requests.  In recent years the FBI has experienced a spike in request submitted to the agency.  In Fiscal Year ("FY") 2021, the FBI received 29,828 FOIPA requests (a 34% increase over intake from five years ago), when in FY 2016, intake was 22,220 requests.  In FY 2021, the FBI resolved 29,429 FOIPA requests and reviewed over 868,000 pages of records in response to FOIPA requests.

Personnel Management for the Washington D.C. locality (in which RIDS is located), the minimum hourly salary for an analyst running ETS is $36.03 per hour (GS-11, Step 1) and the maximum hourly salary for an analyst running ETS is $66.76 per hour (GS-13/Step 10).[7]   *See https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2021*.   *Id.* ¶ 37.   It generally takes approximately 46 minutes to set up and run the required ETS scan for a release of 500 pages.   *Id.*   Therefore, with about 46 minutes to set up and run ETS, the direct cost of duplication is

- The minimum operator cost for the ETS process alone is $26.81.

- The maximum operator cost for the ETS process alone is $49.69.

- The average operator cost for the ETS process alone is $38.25.

*Id.*  While the amount of time it takes to set up and run ETS can vary with the complexity and amount of pages, the associated impact on operator time and costs are marginal.   *Id.* Systematically, operator time would only increase with over 500 pages and decrease with less than.   *Id.* Moreover, the costs listed above do not include the added time and costs associated with re-running the scan where corrections are required as a result of an initial scan identifying the need for further review. *Id.*

20.     Prior to running ETS, work items proposed for release are "sealed" by an Expert or Supervisor who has reviewed and approved the Analyst's work.   *Id.* ¶ 38.   This changes the translucent redaction blocks on each page to solid blocks for the release of segregable information. *Id.*

---

7 FY22 salary adjustments are now available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2022, and result in a slightly increased cost over FY21.

21.     As part of the ETS process, an analyst must run multiple ETS searches against each "sealed" work item in the interim release using designated programmatic exempt terms and one or more case-specific exempt terms.  *Id.*  The analyst creates the case specific exempt term list as the case is processed, but the exempt nature of a term often depends on the context in which it appears. ETS assists by flagging designated terms for pre-release review so that information can be exported from the classified FDPS enclave to a CD suitable for public dissemination; however, human analysis is required to manually review any flagged "hits" to determine if the information was proposed for release in error, or in context the information should be released under FOIPA. *Id.*

22.     If the analyst determines the term and associated information to be exempt and proposed for release in error, the analyst must have an Expert or Supervisory employee "unseal" the work item so corrections can be made in advance of public release.  *Id.*  Once corrected by the analyst and verified by the Expert or Supervisor, the Expert or Supervisor must reseal the work item before the analyst runs the scan again.  *Id.*

23.     As a quality control measure, FOIPA analysts do not have the ability in FDPS to seal and unseal their own work.  *Id.* This process is repeated until no exempt information is released.  *Id.* This is a time consuming and labor-intensive process, but absolutely necessary to insure that no classified or exempt information is inadvertently released and that all segregable non-exempt information is released under FOIPA.  *Id.*

24.     The direct costs of running ETS and preparing CDs for public dissemination by the FBI still exceed $15.00.  *Id.* ¶ 39.  While the improvements discussed above which eliminated some process steps, when pay rates and average operator time to perform the current steps are calculated, the direct cost still remains above $15.00 and is therefore reasonable. *Id.*

25.     The factors outlined above work together to form the basis of the FBI's interim release policy and the FBI's $15.00 per CD fee, both designed to equitably provide the largest number of requesters the most amount of information possible on a rolling monthly basis at a reasonable cost. *Id.* ¶ 40.


Dated: January 21, 2022                    Respectfully submitted,

                                          MATTHEW M. GRAVES, D.C. Bar # 481052
                                          United States Attorney

                                          BRIAN P. HUDAK
                                          Acting Chief, Civil Division

                                          */s/ Stephanie R. Johnson*
                                          STEPHANIE R. JOHNSON
                                          D.C. Bar # 1632338
                                          Assistant United States Attorney
                                          Civil Division
                                          555 4th Street, N.W.
                                          Washington, D.C. 20530
                                          (202) 252-7874
                                          Stephanie.Johnson5@usdoj.gov

                                          *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND<br>RESEARCH CENTER,<br><br>     *Plaintiff,*<br><br>   v.<br><br>DEPARTMENT OF JUSTICE,<br><br>     *Defendant*. | Civ. A. No. 18-1868 (TNM) |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Defendant, the Department of Justice ("Department") submits this response to Plaintiff's Statement of Undisputed Material Facts.

1.     On 7 September 2012, AARC submitted to the Federal Bureau of Investigation ("FBI") a Freedom of Information Act ("FOIA") request for copies of historical indices of electronic surveillance activities. (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8, 2018).)

**DEFENDANT'S RESPONSE:** Undisputed.

2.     After AARC commenced this litigation, FBI began processing responsive records and began releasing records at a rate of approximately 500 pages/month, which it releases by mailing a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).)

**DEFENDANT'S RESPONSE:** Undisputed.

3.     FBI insisted that AARC was required to pay $15 per CD for these releases and that it would stop processing records if AARC ceased payment. (*Id.* at 2.).

**DEFENDANT'S RESPONSE:** Undisputed.

4.      On 9 June 2017, David Hardy authored and signed a sworn declaration describing the Integrity system used by FBI.  3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. Dep't of Just.*, No. 13-556 (D.D.C.).

**DEFENDANT'S RESPONSE:** Undisputed.

5.      All records responsive to a request must be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of whether or not the records are classified.  *Id.*

**DEFENDANT'S RESPONSE:** Undisputed.

6.      Then, once a record has been processed for release in the FDPS, an employee must export each section of a document as a multi-page TIF file to his local computer drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

7.      Then the employee must manually rename each TIF file and save it to a common shared drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

8.      Then the employee must convert each multi-page TIF file into a series of single page text files because Integrity cannot read TIF files.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

9.      The employee cannot convert TIF files to text files on his computer and must walk to a separate computer to do the conversion.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

10.      The employee must then copy the newly created text files from the shared drive to his local computer drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

11. Then the employee must "reflect[] upon the processed records" and create keywords for the Integrity system to search for. *Id.* ¶ 8.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

12. Then the employee runs the Integrity scan using the custom keywords he created against each single-page text document. *Id.* ¶ 9.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

13. Then the employee must manually review the automated scan results. *Id.*

**DEFENDANT'S RESPONSE:** Undisputed to the extent that the employees still perform manual reviews.

14. Then the employee must run a second Integrity scan using general keywords against each single-page text document. *Id.*

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

15. Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted. *Id.* ¶ 10.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

16. Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again. *Id.*

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

17. Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD. *Id.* ¶ 11.

**DEFENDANT'S RESPONSE:** Undisputed.

18.     Only GS-11 through GS-13 employees can perform any of the above-described work.  *Id.* ¶ 14.

**DEFENDANT'S RESPONSE:** Undisputed.

19.     Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages.  *Id.* ¶ 13.

**DEFENDANT'S RESPONSE:** Disputed. It generally takes approximately 46 minutes to set up and run the ETS scan for 500 pages.


Dated: January 21, 2022                    Respectfully submitted,

                                           MATTHEW M. GRAVES, D.C. Bar # 481052
                                           United States Attorney

                                           BRIAN P. HUDAK
                                           Acting Chief, Civil Division

                                           */s/ Stephanie R. Johnson*
                                           STEPHANIE R. JOHNSON
                                           D.C. Bar # 1632338
                                           Assistant United States Attorney
                                           Civil Division
                                           555 4th Street, N.W.
                                           Washington, D.C. 20530
                                           (202) 252-7874
                                           Stephanie.Johnson5@usdoj.gov

                                           *Attorneys for Defendant*