UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND       *
RESEARCH CENTER, INC.,           *
                                 *
    Plaintiff,                   *
                                 *
v.                               *   Civil Action No. 1:18-cv-01868 (TNM)
                                 *
DEPARTMENT OF JUSTICE,           *
                                 *
    Defendant.                   *
                                 *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Plaintiff Assassination Archives and Research Center, Inc. ("AARC") commenced this litigation against Defendant Federal Bureau of Investigation ("FBI")[1] in 2018 in part to obtain copies of historical indices of electronic surveillance activities—the majority of which are over sixty years old—that AARC had requested in 2012. (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8, 2018).) After AARC commenced this litigation, FBI began processing responsive records and began releasing records at a rate of approximately 500 pages/month, which it released by mailing a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).) FBI insisted that AARC was required to pay $15 per CD for these releases and that it would stop processing records if AARC ceased payment. (*Id.* at 2.) At a 6 August 2019 Status Conference,

---

[1] FBI is treated herein as the "Defendant" to avoid confusion because the case is limited to questions about FBI's processing of AARC's Freedom of Information Act ("FOIA") request, even though the Department of Justice is the proper party Defendant as a matter of law.

the Court directed AARC—over AARC's objection[2]—to file a motion for partial summary judgment alleging that FBI was charging unreasonable fees to process this request. After several delays due in large part to the coronavirus pandemic, AARC filed its motion on 23 November 2021 (Pl.'s Mot. Part. Summ. J., Dkt. #40, *passim* (filed Nov. 23, 2021) [hereinafter AARC's 1st Mem.]), and FBI filed its Opposition on 21 January 2022 (Def.'s Opp'n Pl.'s Part. Mot. Summ. J. & Mot. Compel. Def. to Seek *Open Am.* Stay, Dkt. #45, at 1-9 (filed Jan. 21, 2022)).

When AARC requested an extension the day its Reply was due, the Court denied AARC's entire motion for partial summary judgment, even though both a briefed motion and an opposition were on the record. (Order, Dkt. #47, at 4 (filed Feb. 14, 2022).) The Court directed that AARC should pay the fees it allegedly owed to FBI within thirty days, and that if it did not, FBI should file a motion arguing that "production is complete given that [AARC] is refusing to pay processing fees." (*Id.* at 3.) After AARC did not pay the fees that it maintains have not been properly assessed, FBI finally filed the Motion on 18 April 2022 that AARC had asked the Court to direct it to file almost three years earlier. (Def.'s Mem. P. & A. Supp. Def.'s Mot. Part. Summ. J., Dkt. #49, *passim* (filed Apr. 18, 2022) [hereinafter FBI's Mem.].) For the reasons stated herein, the Court should find that FBI improperly denied AARC's request for a public interest fee waiver and that, even if the fee waiver denial was proper, the duplication fees charged by FBI have not been "limited to reasonable standard charges for document . . . duplication,"[3] 5 U.S.C. §

---

[2] AARC maintained that because FBI legally bears the burden of proving that its fees are reasonable, it should be required to file a dispositive motion supported by admissible evidence on that issue first, which AARC could then oppose.

[3] The two issues are separate and distinct. *Accord Stein v. DOJ*, 197 F. Supp. 3d 115, 123 (D.D.C. 2016) ("The question of whether [a separate statutory fee provision] prohibits Defendant from charging Plaintiff any duplication fees is, as Plaintiff correctly told Defendant in October 2015, 'a separate issue from the public interest fee waiver issue.'"). AARC's entitlement to a fee waiver—or lack thereof—has no bearing on FBI's duty to only assess reasonable fees in the first place.

552(a)(4)(A)(ii)(III), and accordingly order FBI to return all fees paid to it by AARC thus far with interest, and enjoin FBI from charging any more fees to AARC for the processing of this request.

### I.  FBI IMPROPERLY DENIED AARC A PUBLIC INTEREST FEE WAIVER

Before the Court can consider whether FBI charged reasonable fees, it must first determine if FBI has adequately proven that its decision to deny AARC's request for a public interest fee waiver was proper under FOIA. If the Court finds that FBI has not so proven, it must deny this Motion and find that FBI is not entitled to assess any fees for this request.

Despite being warned several times that it must demonstrate the legality of its fee waiver denial (*see*, *e.g.*, AARC's 1st Mem. at 2 n.4), FBI has not even *mentioned* its fee waiver decision except to imply that AARC somehow failed to exhaust its administrative remedies on the issue, which is quite simply not an issue in this case. (*See* FBI's Mem. at 11 (arguing that AARC did not appeal FBI's fee waiver denial dated 13 September 2018).)[4] Simply put, FBI did not issue its fee waiver denial until 13 September 2018, and AARC commenced this litigation on 8 August 2018. It is well established that no administrative appeal is required of an agency determination issued during litigation. Therefore, this argument is frivolous, and the Court should reject it outright.

Therefore, it is entirely improper for FBI to seek summary judgment on the question of whether it assessed reasonable fees before it even attempts to prove that its fee waiver determination was justified under FOIA. The uncontroverted facts show that AARC submitted a request in which it requested a public interest fee waiver. It stated:

---

[4] FBI confusingly argues later that AARC "may not be heard in this Court on any issue outside the scope of his [sic] administrative appeal, and it has waived any challenge to the reasonableness of the fees because the denial of a fee waiver is distinct from a challenge to . . .

3

As president of the AARC, I have been interviewed by many television news programs and documentaries concerning the assassinations of President Kennedy and Dr. Martin Luther King, Jr., the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), and related topics. I have also appeared on radio programs, including the Voice of America and The Larry King Show. I have appeared on a number of television programs, including CNN, Fox News, and Good Morning America (CBS). The Washington Post ran an op-ed piece by me on the need to release the records of the House Select Committee on Assassinations. This article was widely reprinted in other papers, as was an article on the AARC which was disseminated by the Associated Press. On June 8, 1997, the Washington Post published an Outlook Section article I wrote on the assassination of Dr. Martin Luther King, Jr. and the case of his alleged assassin, James Earl Ray. I have been quoted by Reuters, the Associated Press, the New York Times, the Washington Post and numerous other representatives of the news media on matters pertaining to the assassinations of President Kennedy and Dr. King.

I testified to both houses of Congress regarding the pending legislation to require disclosure of records pertaining to the assassination of President Kennedy. In November 1993, I testified before the House Subcommittee on Legislation and National Security regarding the implementation of the JFK Act. On several occasions I testified at hearings held by the Assassination Records Review Board, a five-citizen panel appointed to enforce the JFK Records Act.

*****

As noted above, the purposes [sic] of the AARC is to gather, preserve and disseminate information to the public regarding political assassinations. The AARC maintains both extensive hard copy files and digital copies of government records which comprise approximately one million pages. Because possible connections of organized crime figures to the assassinations of President John F. Kennedy, Dr. Martin Luther King. and Senator Robert F. Kennedy figure prominently in the investigations of these murders, the holdings of the AARC, both bard copy and digital, reflect this. The public interest in such records is undeniable. There is also a profound public interest in such materials even if they do not pertain to the above-cited political assassinations, particularly where such surveillances were unlawful or related to investigations which were not done for law enforcement purposes.

In light of the facts recited above, the AARC [is] . . . entitled to a public interest fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities. The public interest in such matters

---

the amount of fees assessed" (*id.* at 9), which implies that AARC filed an appeal of the fee waiver denial, which, as noted above, it did not.

is obvious and profound. Our capability to disseminate the information has been amply demonstrated above.

(Letter from Lesar to Hardy of Sept. 7, 2012, Dkt. #45-1, at 45-46 (filed Jan. 21, 2022).) This description amply satisfies the statutory criteria which states that requested information is "in the public interest [if] it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requestor." 5 U.S.C. § 552(a)(4)(A)(iii). Because FBI has not even attempted to argue that its determination was proper, it should be found to have forfeited that argument, which renders the remainder of this Motion moot.[5]

## II.  FBI'S FEES WERE NOT REASONABLE AT THE TIME THEY WERE ASSESSED

As FBI admits, the process described below was in place at the time FBI assessed the fees. (*See* 1st Seidel Decl., Dkt. #45-1, ¶ 34 (filed Jan. 22, 2022) ("[T]he detailed description provided by Plaintiff . . . reflects the FBI process at the time of the referenced litigation (2017).").) The general standard for judicial review of agency FOIA determinations is whether or not the decision was proper at the time it was made. *See Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1284 (D.C. Cir. 1983) (indicating that to invoke Exemption (b)(3), an agency must be able to demonstrate that the statute being invoked in conjunction with Exemption (b)(3) "was in effect at the time of the FOIA request"); *see also King v. DOJ*, 830 F.2d 210, 216 (D.C. Cir. 1987) (indicating that for purposes of Exemption (b)(1), a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made). Accordingly, even accepting as true FBI's claims regarding its current system of

---

[5] This conclusion is additionally justified since at least one district court has previously held that AARC was entitled to a public interest fee waiver. *See AARC v. CIA*, 334 F.3d 55, 56 (D.C. Cir. 2003) (noting that the district court ordered the agency to waive duplication fees over its objection).

processing FOIA requests, this was not the system in place when FBI *began* processing AARC's request, which was when it made the fee assessment. Therefore, the Court must decide if the fees assessed *in 2018* were reasonable, which it should find was not the case.

The referenced declaration asserted that $15/CD was a reasonable fee because it did not exceed the "direct labor costs" incurred by forcing a GS-11 to GS-13 employee to be "active through a majority of the process." (3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. DOJ*, No. 13-556 (D.D.C.) [hereinafter *NSC* Hardy Decl.], Dkt. #40-1 (filed Nov. 23, 2021).)[6] Simply put, even though FBI offered evidence which demonstrates that the direct costs of releasing a CD containing 500 pages exceed $15, that is not the end of the matter. The "reasonable standard charges" restriction, *id.* § 552(a)(4)(A)(ii)(III), and the "direct costs" restriction, *id.* § 5 U.S.C. § 552(a)(4)(A)(iv), on an agency's ability to assess duplication fees are not two distinct provisions which can be treated independently of one another. FOIA itself originally treated these two requirements *together* stating that "fees shall be limited to reasonable standard charges for document search and duplication and provide for recovery of only the direct costs of such search and duplication." 5 U.S.C. § 552(a)(4)(A) (1974). This understanding was implicit in the relevant court decisions of the time, which always treated the two provisions together and which remain controlling precedent. *See*, *e.g.*, *Better Gov't Ass'n v. Dep't of State*,

---

[6] Judge Chutkan granted summary judgment to FBI in that case over the plaintiffs' objection because she interpreted the remand order from the D.C. Circuit to be limited to the question of whether the $15/CD charge exceeded FBI's direct costs, not whether those direct costs were reasonable. *Nat'l Sec. Counselors v. DOJ*, 305 F. Supp. 3d 176, 180 (D.D.C. 2018), *aff'd* No. 18-5171, 2018 U.S. App. LEXIS 31112 (D.C. Cir. Nov. 1, 2018). Accordingly, the instant case is the first time that any court has had the opportunity to fully adjudicate the reasonableness of FBI's $15/CD duplication fee in light of the *NSC* Hardy Declaration; the D.C. Circuit's previous consideration of this fee rate predated—and was responsible for—the public disclosure of this information, and Judge Chutkan's brief observations regarding the fee rate, *id.*, are simply *dicta* which this Court should respectfully decline to follow because they impermissibly shifted the burden to the plaintiffs to prove that the fees were unreasonable instead of forcing FBI to prove that they were reasonable.

780 F.2d 86, 88-89 (D.C. Cir. 1986) ("FOIA permits agencies to impose 'reasonable standard charges for document search and duplication' to recover the direct costs of such services.").

When Congress replaced this quoted language with the current multi-paragraph version of 5 U.S.C. § 552(a)(4)(A) as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1803, it gave absolutely no indication in the legislative history that it intended to separate these two considerations. The FOIA amendments were absent from the congressional reports on this large omnibus act, and the only mentions of the fee amendments in floor statements focused on how the intent was to give greater guidance to agencies and make it easier for agencies to make fee determinations and for certain types of requesters to obtain preferential fee treatment, *not* to separate the "direct costs" requirement from the "reasonable standard charges" requirement. *See, e.g.*, 132 Cong. Rec. S14297-14299 (Sept. 30, 1986) (statement of Sen. Leahy). This understanding has been adopted by courts since that amendment as well, undermining any argument that decisions like *Better Government Association* are no longer good law. *See Pollack v. DOJ*, 49 F.3d 115, 119 (4th Cir. 1995) ("[T]he Act specifically requires the government to publish a uniform schedule of fees, authorizing each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review."); *Goulding v. IRS*, No. 97-5628, 1998 U.S. Dist. LEXIS 9143, at *26 (N.D. Ill. June 2, 1998) ("[FOIA authorizes] each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review.").

As the *Pollock* opinion shows, it is clearly appropriate for a court to consider whether the direct costs are reasonable, and a contrary holding would run counter to the general rule of FOIA that agencies must only assess "reasonable standard charges" for duplication. If an agency could simply utilize a patently unreasonable duplication method and then hide behind the fact that it is only charging the "direct costs" it incurred using that patently unreasonable duplication method,

7

the "reasonable standard charges" limitation would be effectively *subordinate* to the "direct costs" limitation, instead of being the co-equal factor intended by Congress.[7]

The next legal question is whether or not an agency can ignore the statutory restrictions placed on it by FOIA by implementing an unnecessarily complex and redundant "security review process," but this question has already been addressed by another court in this Circuit. In the case *National Security Counselors v. CIA*, Judge Howell addressed an analogous controversy, in which the Central Intelligence Agency and Department of State were accused of using overcomplicated processes for duplicating records in electronic format as a justification for categorically determining that no records were readily reproducible in electronic format. 960 F. Supp. 2d 101, 202-07 (D.D.C. 2013). In that case, as in this case, the underlying explanation for the agencies' processes was that the FOIA processing system was on each agency's classified network, and so extra steps were required to move records from the classified network to the unclassified network. Judge Howell stated that she was "somewhat skeptical regarding the State Department's explanation of the labyrinthine steps that are necessary to move a document from the classified system to an unclassified piece of electronic media," *id.* at 205, and separately opined, "I can't imagine a more cumbersome process to have been created to do FOIA processing, I really can't. It boggles the mind that the CIA takes unclassified documents, puts them on a classified computer system, which can only print for obvious reasons in order to process what might otherwise be a fairly simple FOIA request for unclassified documents." (Tr. of 12/16/11 Status Conf. at 7:18-23, *Nat'l Sec. Counselors v. CIA*, No. 11-443 (D.D.C.), Dkt.

---

[7] A similar legal question would arise if an agency deliberately searched for records using the most time-consuming process when it was able to conduct a much shorter search, such as reviewing every entry in a database one at a time for 100 hours instead of using the database's search function for 10 minutes, and then insisted that every requester must pay for the direct costs of the longer process.

8

#40-2 (filed Nov. 23, 2011).) Despite these judicial warnings in 2013 and 2011, respectively, involving two separate agencies, FBI implemented the next evolution of these processes. In light of the fact that at least one court has held that an agency cannot refuse to provide CDs *at all* based solely on its insistence on using "labyrinthine steps" to create a CD, FBI instead decided to argue that it may use the *cost* of that process to justify charging more fees to requesters than it otherwise would be able to. This Court should solidly decline this invitation to allow an agency to use a process that is deliberately and unnecessarily complicated and redundant to justify higher fees than FOIA would allow if it used a reasonable process.

With this in mind, it is appropriate to demonstrate the unreasonableness of the process FBI has described in the *NSC* Hardy Declaration by removing all the conclusory editorial text about security and focusing solely on the actual script a FOIA employee must follow to produce a single CD containing 500 pages of unclassified records:

1. First, all records responsive to a request must be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of whether or not the records are classified. *NSC* Hardy Decl. ¶ 6.

2. Then, once a record has been processed for release in the FDPS, an employee must export each section of a document[8] as a multi-page TIF file to his local computer drive. *Id.*

3. Then the employee must manually rename each TIF file and save it to a common shared drive. *Id.*

---

[8] Hardy did not define what constitutes a "section" other than to say, "A release can include multiple sections." *Id.* ¶ 7.

4. Then the employee must convert each multi-page TIF file into a series of single-page text files because Integrity—the FBI security system being described—cannot read TIF files. *Id.*

5. The employee cannot convert TIF files to text files on his computer and must walk to a separate computer to do the conversion. *Id.*

6. The employee must then copy the newly created text files from the shared drive to his local computer drive. *Id.*

7. Then the employee must "reflect[] upon the processed records" and create keywords for the Integrity system to search for. *Id.* ¶ 8.

8. Then the employee runs the Integrity scan using the custom keywords he created against each single-page text document. This scan takes an unspecified amount of time. *Id.* ¶ 9.

9. Then the employee must manually review the automated scan results. *Id.*

10. Then the employee must run a second Integrity scan using general keywords against each single-page text document because Integrity apparently cannot search for these general keywords at the same time as the custom keywords he inputted previously. *Id.*

11. Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted because the Integrity system lacks the common search option of limiting results to whole words. *Id.* ¶ 10.

12. Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again, even though it would already have identified any other unredacted keywords located in the document. *Id*.

13. Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD. *Id.* ¶ 11.

14. Only GS-11 through GS-13 employees can perform *any* of the above-described work. *Id.* ¶ 14.

15. Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages. *Id.* ¶ 13.

16. As a result, for every 4800 pages released to *anyone*, a GS-11 or higher-level employee must spend an *entire 8-hour work day* doing nothing but going back and forth between computers, reviewing records which have already been through a line-by-line FOIA review, and re-running redundant automated scans, instead of searching for or reviewing records in response to FOIA requests.

From the above description, which is drawn *directly* from Hardy's testimony, it is clear that this process served very little actual purpose beyond allowing FBI to claim that it is protecting classified information even though the bulk of records put through it were unclassified from the outset and were only placed on the classified system in the first place because the agency decided to locate the FDPS system there. Moreover, even the assertion that the FDPS system has to be located on the classified system is undermined by Hardy's testimony that after all the Integrity scans have been run, the employee *returned to the FDPS system*, which is presumably still located on the classified network, and *directly* "export[ed] all sections from FDPS into an unclassified PDF format outside FDPS." *Id.* ¶ 11. This "external FDPS location"

appears not to be located on the classified network, begging the question of why it was not used the entire time instead of putting unclassified records on a classified network. However, even setting that odd inconsistency aside, there is no rational reason for the unnecessarily labyrinthine processes described by Hardy, such as converting files from one format to another format, then to a third format, then back to the first format, all on different computers unable to read the other formats, or re-running an entire scan because a single word was redacted, as though that will change whether or not other prohibited words are located, after which a simple export process can be run from the first system to the CD-creation program without any complications.

      With all this in mind, however, whether or not FBI was allowed to use this process is beyond the scope of this case, especially since it claims to have changed at least some of the process. This case is about whether or not FBI can *charge requesters* for the time spent using this bizarre process, and the answer to that question is decidedly in the negative because the direct costs incurred as a result of this process are not "a 'reasonable' amount for the direct costs of document . . . duplication." *Pollack*, 49 F.3d at 119. Accordingly, if the agency would not be allowed under FOIA to charge the direct costs of using this process, then it cannot use the direct costs of using this process as a metric against which other arbitrary fees are measured. As a result, the simple fact that $15/CD was less than the direct costs of using this process does not demonstrate that $15/CD was a reasonable fee. For this reason, the Court should find that FBI has been assessing unreasonable duplication costs to AARC and accordingly deny FBI's Motion. If the Court still finds that FBI was correct to assess fees to AARC, it should accordingly direct AARC to commit to paying all fees or certify the issue for interlocutory appeal, since there remain numerous additional issues regarding this case which require judicial review, including searches and withholdings.

Date:   May 18, 2022

                                              Respectfully submitted,

                                              /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND        *
RESEARCH CENTER, INC.,            *
                                  *
    Plaintiff,                    *
                                  *
    v.                            *   Civil Action No. 1:18-cv-01868 (TNM)
                                  *
DEPARTMENT OF JUSTICE,            *
                                  *
    Defendant.                    *
                                  *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Local Rule 7(h), Plaintiff Assassination Archives and Research Center, Inc. ("AARC") submits this response to Defendant's Statement of Undisputed Material Facts.

1. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

2. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

3. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Admit.

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit, but deny the implication that an appeal was required.

17. Admit.

18. Admit, but deny the implication that Plaintiff waived any objection to the fees.

19. Admit.

20. Admit.

21. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it. Plaintiff admits that it has not paid $52.50.

22. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it. Plaintiff admits that it has not paid $52.50.

23. Admit that Plaintiff failed to submit fees and that FBI stopped processing the remaining pages. Deny that the fees were required.

24. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

25. Admit.

26. No response is required to this legal conclusion.

27. No response is required to this legal conclusion.

28. Admit that FBI made the determination. Deny that the determination was in accordance with the regulations.

29. No response is required to this legal conclusion.

30. Plaintiff has no direct knowledge of this allegation and cannot admit or deny it. Plaintiff admits that it has not paid $52.50.

Date:   May 18, 2022

                                                Respectfully submitted,

                                                /s/ Kelly B. McClanahan
                                              Kelly B. McClanahan, Esq.
                                              D.C. Bar #984704
                                              National Security Counselors
                                              4702 Levada Terrace
                                              Rockville, MD  20853
                                              301-728-5908
                                              240-681-2189 fax
                                              Kel@NationalSecurityLaw.org

                                              *Counsel for Plaintiff*